UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

J.V. and M.Q. on behalf
of their minor child C.V.,

       Plaintiffs,

v.                                         Civ. No.13-01204 MV/KBM

Albuquerque Public Schools,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Albuquerque Public School's Motion for Summary Judgment as to All Counts in Plaintiffs' Complaint [Doc. 24]. The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that Defendant's Motion is well-taken and will be granted.

### BACKGROUND

"The facts supported by evidence, [viewed] in the light most favorable to [Plaintiffs]" as the party opposing the summary judgment, are as follows.[1] *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 662 (10th Cir. 2010). C.V. was a seven-year-old special education student at Mary Ann Binford Elementary (the "School"). Doc. 24-1 ¶ 4. He was seven years old, weighed approximately 50 pounds and was four feet one inch tall. Compl. ¶ 20. C.V. was a student in the classroom of teacher Paula Gutshall and educational assistant Ms. Trujillo. Doc. 24-2, ¶¶ 4-5.

---

[1] In their response in opposition to Defendant's motion, Plaintiffs state that they dispute certain facts as set forth in Defendant's statement of undisputed facts. A careful reading of Plaintiffs' response, however, makes clear that Plaintiffs do not offer conflicting evidence that creates a dispute of material fact, but rather offer supplemental facts, characterizations of the facts presented in Defendant's motion, and conclusions that they seek the Court to draw from the facts. To the extent that there is a dispute as to material facts, the Court has construed those facts in the light most favorable to Plaintiffs. Further, the Court has included in its statement of the facts the supplemental facts presented by Plaintiffs, to the extent those facts are relevant.

Maria Martinez, a social worker who has been employed by the Albuquerque Public Schools ("APS") Board of Education for 12 years, was working at the School. Doc. 24-2 ¶ 3. Martinez has worked only with children in special education programs, providing family and classroom support for children with special needs. Doc. 24-3 at 4:15-5:20.

C.V. was eligible for special educational services for being "autistic" and "gifted." Doc. 27-3, ¶ 10. On November 22, 2010, a Behavior Intervention Plan ("BIP") was created for C.V. because of "persistent and/or severe behavior" that was "interfere[ing] with [his] learning or the learning of others and interventions [were] needed to positively redirect the targeted behavior." Doc. 27-5. Specifically, the BIP notes that it was developed because of "Inappropriate classroom behavior; physical contact; no remorse when safety is a concern (hitting, kicking, biting, pulling, pushing, lying)." *Id.* The BIP includes a "Crisis Plan," which indicates that "an emergency situation or behavior crisis [will] be handled" as follows: "1.) Severity of physical contact, parent notified; 2.) Crisis Team called." *Id.* The BIP does not specify who is on the "Crisis Team." *Id.* The BIP does not address the issue of physical restraint.

On the morning of November 14, 2011, Trujillo told Martinez that C.V. had been disrupting his class and misbehaving. Doc. 24-2, ¶ 5. Martinez offered to take C.V. to her classroom. *Id.* ¶ 6. While in her classroom, C.V. began misbehaving, hitting toys in the room, and throwing his shoes at her. *Id.* At that point, Martinez called the Assistant Principal, Misti Miller, for help. *Id.* The Assistant Principal asked Martinez to bring C.V. to the office. Doc. 24-1, ¶ 6. While on the way to the office, C.V. took off running. Doc. 24-2, ¶ 7. The Assistant Principal and Martinez attempted to locate C.V. to ensure that he did not run off campus. *Id.*

Martinez attempted to call C.V.'s mother so that she could come to the School and help calm C.V. Martinez left a number of messages for C.V.'s mother between 11:15 and 11:30 a.m.,

but was unable to reach her. *Id.* ¶ 8. Martinez was able to reach C.V.'s father, but he refused to come to the School to help deescalate C.V. *Id.*

C.V. ran into the School nurse's office, where he locked himself in a bathroom. *Id.* ¶ 8. He then ran out of the nurse's office and into the cafeteria. *Id.* ¶ 9.

At approximately 12:15 p.m., APS Police Officer Xiomara Sanchez was dispatched to the School, regarding a report that a child was out of control. Doc. 24-7, ¶ 4. The record does not indicate who called APS and made this report, but the logical inference is that it was someone in the School administration. When she first arrived at the School, Sanchez met with the Principal and Assistant Principal, who informed her that C.V., a student at the School, had been running around the School and causing problems since approximately 10:30 a.m. *Id.* ¶ 5. They further informed her that C.V.'s parents had been asked to come to the School, but that they had refused. *Id.* ¶ 6.

The Principal escorted Sanchez to the cafeteria. *Id.* ¶ 7. When C.V. saw the Principal and Sanchez, he took off running, and Sanchez went to the School office to call C.V.'s parents. *Id.* ¶ 7. She first spoke with C.V.'s father, who refused to come to the School until after 2:30 p.m., as he was at the airport. *Id.* ¶ 8. He told Sanchez to call C.V.'s mother. *Id.* Sanchez then called C.V.'s mother. *Id.* ¶ 9. Sanchez identified herself as "school security," and informed C.V.'s mother that, because C.V.'s behavior was out of control, she needed to come pick him up from School. Doc. 27-3, ¶ 14. C.V.'s mother advised that she would come, but that it would take approximately 30 minutes, as she also needed to pick up her younger son from preschool. *Id.* ¶ 15. Sanchez asked C.V.'s mother for permission to restrain him. *Id.* ¶ 16. C.V.'s mother responded, "Yes." *Id.*

C.V.'s mother did not understand that Sanchez was seeking permission to handcuff C.V.

3

*Id.* Rather, she thought that a trained member of C.V.'s behavioral intervention team would hug or hold him with his or her body to calm him down. *Id.* There is no evidence in the record that C.V.'s mother asked Sanchez to explain what she meant by "restrain."

C.V. was ultimately led to Room 127. Doc. 24-2, ¶ 10. When Sanchez arrived in the room, C.V. charged at her and attempted to run out of the room. Doc. 24-7, ¶ 13. Sanchez blocked the door to prevent C.V. from running out of the room. *Id.* While in Room 127, C.V. kicked his legs and swung his arms to knock items off of the desks in the room, and started pulling computer power cables out of the wall sockets. Doc. 24-2, ¶ 11. Martinez approached C.V. and asked him to stop, since he was in danger of harming himself. *Id.* C.V. started swinging a power cord at Martinez in an attempt to hit her. He then lay on his back and started to kick Martinez. *Id.* He made contact with her several times and caused her to experience pain. *Id.*

When Sanchez would not let him leave the room, C.V. kicked Sanchez in the shin. Doc. 27-2. Sanchez repeatedly said, "You are not going out." *Id.* C.V. continued to move around, poking and getting down, trying to grab things, pulling, not sitting still. *Id.* He sat on the floor with his legs crisscrossed; Martinez thought to herself, "Oh good, he is sitting down," because in her view, that was safe. *Id.*

At some point, the phone rang, and someone told Martinez that C.V.'s mother was there, but Martinez did not know the exact location. *Id.* Martinez heard Sanchez say, "Don't do that," and looked up to see C.V. playing with a rubber band. Martinez thought, "Oh no," realizing that C.V. was planning to shoot the rubber band at Sanchez. *Id.* Sanchez said, "Don't do that, give me the rubber band." *Id.* C.V. was pointing the rubber band at Sanchez's face. *Id.* He shot it at her and got her somewhere in the knee area. *Id.* Sanchez told him not to do it again; he shot it again, and it hit her in the chest area. *Id.* C.V. got up and crawled over to retrieve the rubber

4

band.  *Id.*

After the second time he shot the rubber band, Sanchez was able to put her foot over it to prevent C.V. from shooting it a third time.  Doc. 24-7, ¶ 18.  C.V. then began tugging on Sanchez's leg in an attempt to get the rubber band.  *Id.* ¶ 19.  When he was unsuccessful with his attempt to tug her leg away, C.V. started to kick Sanchez.  *Id.*  Sanchez warned C.V. on a number of occasions that if he did not stop kicking her and endangering himself and the other individuals in the room, she would place him in handcuffs.  *Id.* ¶ 20.

C.V. ignored Sanchez's warnings.  *Id.* ¶ 21.  Sanchez said, "What did I tell you? Get over here and sit down."  Doc. 27-2.  C.V. got up and "was wiggly and wiggly," and that is when Sanchez handcuffed him.  *Id.*  C.V. continued to "kick and kick and kick" and wiggle, attempting to get off of the chair, when Sanchez handcuffed him.  *Id.*

Sanchez double locked the handcuffs to prevent the handcuffs from tightening.  Doc. 24-7, ¶ 23.  She ensured that there was a thumb-width of space, or approximately one-inch, between the handcuffs and C.V.'s wrist.  *Id.*

C.V. stood up in the chair, and then sat back down while yelling that he wanted the handcuffs removed.  *Id.* ¶ 24.  Sanchez advised C.V. that if he sat in the chair and settled down, she would immediately take the handcuffs off.  *Id.*  C.V. stood up several more times and at one point dragged the chair towards Sanchez and tried to kick her.  C.V. continued to kick and struggle while in the handcuffs.  *Id.*

Martinez observed that C.V.'s hands were "red, red, red."  Doc. 27-2.  She further observed that C.V. was trying to pull his hands out of the handcuffs, and that his hands were really red, because he was pulling the chair.  *Id.*  The cuffs were loose enough that C.V. could have slipped his hands out of the cuffs if he had thought to do so.  Doc. 24-7, ¶ 26.

5

After approximately 15 minutes, Officer Villonez arrived. *Id.* ¶ 27. When he arrived, C.V. was struggling and kicking. *Id.* C.V. stood up and postured himself as if he was going to charge at Villonez. *Id.* In a commanding tone, Villonez told C.V. to sit and calm down. *Id.* Approximately thirty seconds later, C.V.'s mother entered the room. *Id.*

C.V.'s mother demanded that Sanchez remove the handcuffs. Doc. 27-3, ¶ 22. She took out her cell phone and started taking photographs. *Id.* Sanchez removed the handcuffs. *Id.* At that point, C.V. had been in the handcuffs for approximately 15 minutes. Doc. 24-7, ¶ 29. There were welts and scratches on C.V.'s wrists where the handcuffs had cut into him as he struggled, and his face and eyes made apparent that he had been crying. Doc. 27-3, ¶ 20.

On their way out, C.V.'s mother withdrew him from the School effective immediately. *Id.* ¶ 28. C.V. cannot drive by the School, or enter the School parking lot, without throwing up. *Id.* ¶ 29. For the remainder of the 2011 to 2012 school year, C.V. attended Los Ranchos Elementary School. *Id.* C.V.'s father, J.V., testified that he thinks that C.V.'s "disability has nothing to do with . . . him being handcuffed." Doc. 24-5.

On December 19, 2013, C.V.'s parents, on behalf of C.V., commenced this action against APS, by their Complaint for Recovery of Damages for Violations of the Americans With Disabilities Act ("ADA"). Doc. 1-1. In Count I, Plaintiffs allege that Defendant discriminated against C.V. when Sanchez handcuffed him as a result of the manifestations of his disability and mental condition, in violation of the ADA. In Count II, Plaintiffs allege that Defendant failed to develop adequate training and policies to accommodate children with disabilities, in violation of the ADA. On August 21, 2014, Defendant filed the instant motion for summary judgment, arguing that neither the discrimination claim nor the failure to train claim states a violation of the ADA. Doc. 24. Plaintiffs oppose the motion.

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. at 248.

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab*., 992 F.2d 1033, 1036 (10th Cir. 1993) (citations omitted). The moving party need not negate the nonmovant's claim, but rather must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc*., 912 F.2d 1238, 1241 (10th Cir. 1991) (citation omitted). The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment, *see Pueblo v. Neighborhood Health Ctrs., Inc*., 847 F.2d 642, 649 (10th Cir. 1988), but rather must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citation omitted).

Upon a motion for summary judgment, the Court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be

drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp. 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law. *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

## DISCUSSION

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To establish a claim against APS for discrimination under Title II of the ADA, Plaintiffs must prove that C.V.: (1) is a qualified individual with a disability; (2) was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination was by reason of C.V.'s disability. *Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir. 1999). It is undisputed that C.V. is a qualified individual with a disability. APS argues, however, that Plaintiffs cannot establish that C.V. was denied the benefits of APS's services or was otherwise discriminated against by APS, or that any alleged denial or discrimination was by reason of C.V.'s disability. Accordingly, APS argues, Plaintiffs cannot establish their discrimination claim as set forth in Count I. APS further argues that, because there must be an underlying violation to establish a failure to train claim, Plaintiffs cannot establish their failure to train claim as set forth in Count II.

I.    Count I:   Discrimination Claim

In Count I, Plaintiffs allege that APS discriminated against Plaintiff when Sanchez handcuffed him to a chair and watched him struggle, because of manifestations of his disability

and medical condition.   APS argues that the Court should apply one or both theories that have developed for analyzing ADA claims in the context of an arrest.   Plaintiffs argue that this is incorrect, as the benefit at issue here is not an arrest but an education.   The Court need not decide whether APS is correct, as even under the test articulated by Plaintiffs, Plaintiffs fail to establish a discrimination claim under the ADA.

According to Plaintiffs, APS, a public entity, provides a benefit, namely, education.   In their response, Plaintiffs first argue that APS denied C.V. an education because as a result of the handcuffing, C.V.'s mother "immediately withdrew him from school," C.V. was unable to "drive by the school without throwing up," and, when he was attending a different school later that same year, on one occasion, the presence of police officers caused him to "kick and hit fellow students and . . . run into the parking lot."   Doc. 27 at 9.   This argument falls short of presenting evidence that APS denied C.V. the benefit of an education.   Based on Plaintiffs' own evidence, it was his mother's decision, not the School's decision, for C.V. to withdraw from the School.   Further, Plaintiffs' evidence demonstrates that C.V. transferred to another elementary school within the APS system where he finished the 2011 to 2012 school year; thus, APS actually continued to provide C.V. an education.   At most, Plaintiffs can establish that C.V.'s handcuffing amounted to a constructive denial of the benefit of an education at the same school that C.V. had been attending. Plaintiffs provide no authority, and the Court has found none, to support Plaintiffs' theory that such a constructive denial is sufficient to establish that APS denied C.V. the benefit of an education in violation of the ADA.

Plaintiffs next argue that, by handcuffing C.V. to a chair, APS failed to make reasonable accommodations for his disabilities.   Regulations implementing Title II of the ADA require public entities to "make reasonable modifications in policies, practices, or procedures when the

9

modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7). Before a public entity can be required under the ADA to provide an accommodation, the entity must have knowledge both that the individual is disabled, and that the individual "requires an accommodation of some kind to participate in or receive the benefits of its services." *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1197 (10th Cir. 2007). "[A] public entity is on notice that an individual needs an accommodation when it knows that an individual requires one, either because that need is obvious or because the individual requests an accommodation." *Id.*

Here, Plaintiffs argue that APS knows that it educates disabled children and that Martinez, as an APS employee, was "well aware of C.V.'s disability," and thus that APS failed "to adequately accommodate C.V. during the de-escalation and discipline." Doc. 27 at 14. Knowledge by APS and/or Martinez that C.V. was disabled, however, is insufficient to trigger an obligation on the part of APS to make an accommodation for C.V. Rather, Plaintiffs must also show that APS knew that C.V. required an accommodation. Plaintiffs fail to establish any such knowledge, as they point neither to evidence that C.V. or his family requested an accommodation, nor to evidence that such a need was obvious. Instead, Plaintiffs state that "Martinez was successful throughout the morning a[t] deescalating C.V.," but that her "efforts were thwarted by other APS employees who intervened." *Id.* at 13. This statement is belied by the record, as Martinez testified that it was she herself who, in the first instance, reached out to School administrators for assistance with C.V., and further tried to contact C.V.'s parents for assistance with C.V. Martinez further testified that, through the course of the morning, she was unable to keep C.V. from running off, locking himself in the nurse's office, or controlling his behavior. The logical inference to be drawn from the record is that it was precisely because Martinez was

*unsuccessful* at deescalating C.V. that Sanchez was called in the first place. Moreover, even if the record bore out Plaintiffs' contention that Martinez was able to deescalate C.V., it simply would not follow from such evidence that APS was on notice that C.V. required an accommodation. Accordingly, Plaintiffs have failed to come forward with evidence that APS failed to reasonably accommodate C.V. in violation of the ADA.

In their response, for the first time, Plaintiffs also claim that APS's conduct is discriminatory because it has a disparate impact on disabled children. *Id.* at 10. "To prove a case of disparate impact discrimination, the plaintiff must show that a specific policy caused a significant disparate effect on a protected group." *Cinnamon Hills Youth Crisis Ctr., Inc. v. St. George City*, 685 F.3d 917, 922 (10th Cir. 2012) (citation omitted). "This is generally shown by statistical evidence . . . involving the appropriate comparables necessary to create a reasonable inference that any disparate effect identified was caused by the challenged policy and not [by] other causal factors." *Id.* (citation omitted). Here, Plaintiffs not only failed to allege their disparate impact theory of discrimination in the Complaint, but also fail to provide any evidence, through comparables or otherwise, that any specific APS policy caused a disparate impact on disabled children. Plaintiffs' newly introduced and wholly unsupported statements that APS officers have "targeted" special education children, and that such children are more likely to have "escalated disciplinary issues with law enforcement officers than their non-disabled peers," are insufficient to establish disparate impact discrimination in violation of the ADA.

Plaintiffs thus cannot establish under any theory (denial of a benefit, refusal to make a reasonable accommodation, or disparate impact) that APS denied C.V. the benefits of its services or otherwise discriminated against him. Accordingly, Plaintiffs are unable to prove the second element of their discrimination claim under Title II of the ADA, as set forth in Count I of the

Complaint.

Assuming *arguendo* that Plaintiffs were able to establish that Sanchez's handcuffing of C.V. constituted discrimination, Plaintiffs' discrimination claim would fail nonetheless, because there is no evidence that any alleged exclusion, denial of benefits, or discrimination by APS was by reason of C.V.'s disability. Plaintiffs argue that Sanchez handcuffed C.V. "in order to discipline C.V. for his behavior which was a manifestation of his disability." Doc. 27 at 10. As Plaintiffs seem to concede, Sanchez handcuffed C.V. because of his behavior, which she perceived to be out of control. That his behavior was "a manifestation of his disability" is not sufficient to demonstrate that Sanchez handcuffed him "by reason of" his disability. In fact, there is no evidence that Sanchez knew or should have known of C.V.'s disability. Similarly, there is no evidence to suggest that Sanchez would have treated a non-disabled student exhibiting the same behavior any differently than she treated C.V. Indeed, C.V.'s father, J.V., testified that he thinks that C.V.'s "disability ha[d] nothing to do with . . . him being handcuffed." Doc. 24-5.

Rather than having handcuffed him because of his disability, it appears that Sanchez handcuffed C.V. *despite* his disability. Under these circumstances, Plaintiffs are unable to establish that any alleged denial of a benefit or discrimination by APS was by reason of C.V.'s disability. Accordingly, Plaintiffs cannot establish the third element of their claim for discrimination under Title II of the ADA, as set forth in Count I of the Complaint.

II.     Count II:   Failure to Train

In Count II of the Complaint, Plaintiffs allege that APS "failed and refused to develop adequate training and policies to accommodate children with disabilities." Doc. 1-1 ¶ 58. As set forth above, Plaintiffs cannot establish in the first instance that APS violated the ADA. Because there thus is no underlying ADA violation, Plaintiffs' failure to train claim also must fail. *J.H. v.*

*Bernalillo Cnty.*, No. Civ 12-0128, 2014WL 3421037, *114 (D.N.M. July 8, 2014).

## CONCLUSION

Plaintiffs cannot establish two of the three required elements of their claim of discrimination under Title II of the ADA, as set forth in Count I of the Complaint.   Because there is no underlying ADA violation, Plaintiffs cannot establish their failure to train claim, as set forth in Count II of the Complaint.

**IT IS THEREFORE ORDERED** that Defendant Albuquerque Public School's Motion for Summary Judgment as to All Counts in Plaintiffs' Complaint [Doc. 24] is granted.

DATED this 27th day of March, 2015.

_____
MARTHA VAZQUEZ
United States District Court Judge